UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| LOS PADRES FORESTWATCH, a non-profit organization, <br><br> Plaintiff, <br> v. <br><br> UNITED STATES FOREST SERVICE, PEGGY HERNANDEZ, in her official capacity as forest supervisor for the Los Padres National Forest, <br><br> Defendants. | Case No.: 10-CV-03653-LHK <br><br> ORDER GRANTING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION <br><br> (re: docket #6) |

This action centers on an American Recovery and Reinvestment Act ("ARRA")-funded project, involving the clearing of vegetation within ten feet of the road edge alongside approximately 750 miles of Forest Service roads within the Los Padres National Forest (the "Project"). Plaintiff Los Padres Forestwatch ("Plaintiff") is a non-profit organization consisting of an estimated 800 members, with the organizational goal of protecting threatened and endangered species, and protecting the environment of the Los Padres National Forest. Defendants are the U.S. Forest Service and Peggy Hernandez, the Forest Supervisor for the Los Padres National Forest.

1

Presently before the Court is Plaintiff's motion for a preliminary injunction on the grounds that Defendants failed to comply with the procedural requirements of the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, and that such failure threatens concrete environmental harm to federally listed and sensitive plants, wildlife, and habitat. Defendants oppose preliminary injunctive relief. The Court held a hearing on this matter on February 24, 2011. For the reasons described below, Plaintiff's motion for a preliminary injunction is GRANTED. The scope and terms of the injunction are specified below.

## I. BACKGROUND

### A. Regulatory Framework

#### 1. National Environmental Protection Act (NEPA), 42 U.S.C. § 4231 et seq.

##### a. Environmental Impact Statements and Environmental Assessments

NEPA is a procedural statute that does not "mandate particular results, but simply provides the necessary process to ensure that federal agencies take a hard look at the environmental consequences of their actions." *See High Sierra Hikers Assoc. v. Blackwell,* 390 F.3d 630, 639 (9th Cir. 2004). NEPA requires a federal agency, such as the Forest Service, to prepare a detailed environmental impact statement ("EIS") for "all major Federal actions significantly affecting the quality of the human environment." *See* 42 U.S.C. § 4332(2)(C). "Major federal actions" have been defined to include, among other things, "new or revised agency rules, regulations, plans, policies or procedures, and legislative proposals." *See* 40 C.F.R. § 1508.18(a).

Regulations issued by the Council of Environmental Quality ("CEQ") provide certain factors that an agency should consider in determining whether an action will "significantly" affect the environment. These include: (1) the degree to which the proposed action affects public health or safety; (2) the degree to which the effects will be highly controversial; (3) whether the action establishes a precedent for further action with significant effects; and (4) whether the action is

2

Case No.: 10-CV-03653-LHK
ORDER GRANTING PRELIMINARY INJUNCTION

related to other action which has individually insignificant, but cumulatively significant impacts. *See* 40 C.F.R. § 1508.27(b).

Prior to preparing an EIS, the agency may prepare an Environmental Assessment ("EA") as a preliminary step in determining whether the environmental impact of the proposed action is significant enough to warrant an EIS. *See* 40 C.F.R. § 1508.9. An EA is a "concise public document that briefly provides sufficient evidence and analysis for determining whether to prepare an EIS or a finding of no significant impact." *See Blue Mountains Biodiversity Project v. Blackwood,* 161 F.3d 1208, 1212 (9th Cir. 1998).

### b. Categorical Exclusions

However, in some cases, neither an EA nor an EIS is required. The CEQ has promulgated NEPA regulations, which authorize an agency to use a Categorical Exclusion for a "category of actions which do not individually or cumulatively have a significant effect on the human environment *and* which have been found to have no such effect in procedures adopted by a Federal agency in implementation of these regulations." *Id.* (citing 40 C.F.R. § 1508.4). "Neither an EIS nor an EA is required for actions categorically excluded from NEPA review." *Id.* (citing 40 C.F.R. § 1507.3(b)(2)(ii); 23 C.F.R. § 771.117). Categorical Exclusions, however, are limited "to situations where there is an insignificant or minor effect on the environment." *See Alaska Ctr. for the Env't v. United States Forest Serv.,* 189 F.3d 851, 859 (9th Cir. 1999).

Even if a proposed action appears to fit the Categorical Exclusion invoked, an agency may not use a Categorical Exclusion when "extraordinary circumstances" exist. *See California v. Norton,* 311 F.3d 1162, 1168 (9th Cir. 2002). "Extraordinary circumstances" has been defined as those "in which a normally excluded action may have a significant environmental effect." *Id.* In cases where "extraordinary circumstances" exist, the proposed action requires preparation of an EA or an EIS. *Id.*

3

### c. Scoping Process

In determining the propriety of the use of a Categorical Exclusion, the agency is required to use a "scoping process" to "determine the scope of the issues to be addressed and for identifying the significant issues related to a proposed action." *See Alaska Ctr.,* 189 F.3d at 859 (noting that the Forest Service is required to conduct scoping for "all proposed actions, including those that would appear to be 'categorically excluded.'"). The CEQ regulations do not set forth a specific procedure for scoping, but instead leave most of the decisions regarding scoping to the relevant federal agency. S*ee Kootenai Tribe v. Veneman,* 313 F.3d 1094, 1116-17 (9th Cir. 2002) (noting that "the affirmative duties NEPA imposes on a government agency during the scoping period are limited").

Under the CEQ regulations, "[t]here shall be an early and open process for determining the scope of issues to be addressed and for identifying the significant issues related to a proposed action." *See* 40 C.F.R. § 1501.7. As part of the scoping process, the lead agency (here, the Forest Service) shall "[i]nvite the participation of affected Federal, State, and local agencies, any affected Indian tribe, the proponent of the action, and other interested persons (including those who might not be in accord with the action on environmental grounds), unless there is a limited exception under § 1507.3(c),"[1] in order to provide notice that the agency is beginning to consider the impacts of the proposed action. *Id.* If the scoping process ultimately reveals the existence of "extraordinary circumstances having a significant effect on [the] environment," the agency may not simply invoke the Categorical Exclusion, and is required, at a minimum, to prepare an EA. *See Alaska Ctr.*, 189 F.3d at 859. The arbitrary and capricious standard is applied "to an agency's determination that a particular action falls within a categorical exclusion." *See Bicycle Trails Council of Marin v. Babbitt,* 82 F.3d 1445, 1456 (9th Cir. 1996).

---

[1] The "limited exceptions" in Section 1507.3(c) relate to "classified proposals," involving national defense and/or foreign policy. Those limited exceptions are not relevant here.

**2.     Endangered Species Act (ESA), 16 U.S.C. § 1531 et seq.**

The ESA contains both substantive and procedural provisions designed to protect species listed as threatened or endangered under the Act. *See Forest Guardians v. Johanns,* 450 F.3d 455, 457(9th Cir. 2006). Section 7(a)(2), the substantive provision of the Act, requires federal agencies to "insure that any action, authorized, funded, or carried out by [the] agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species. . . ." *See* 16 U.S.C. § 1536(a)(2).

Section 7(b) then sets forth the process of consultation. It requires that federal agencies consult with the appropriate wildlife agency on every action that "may affect" a threatened or endangered species. *See* 50 C.F.R. § 402.14(a). "May affect" has been interpreted broadly to mean that "any possible effect, whether beneficial, benign, adverse, or of an undetermined character," triggers the consultation requirement. *See* 51 Fed. Reg. 19926, 19949 (June 3, 1986). The ESA generally envisions a three-step consultation process. *See Forest Guardians,* 450 F.3d at 457. First, the agency contemplating action must request information from the appropriate federal consulting agency, the Fish & Wildlife Service or the National Marine Fisheries Service, regarding "whether any species which is listed or proposed to be listed may be present in the area of such proposed action." *Id.* (citing 16 U.S.C. § 1536(c)(1)).

If so, and if the action constitutes a "major construction activity," then the agency is required to produce a "biological assessment" (or "BA") in accordance with ESA "for the purpose of identifying any endangered species or threatened species which is likely to be affected by such action." *See* 50 C.F.R. § 402.12. If the BA concludes that there are no listed species or critical habitat present that are likely to be adversely affected, and the wildlife agency confers, then formal consultation is not required. *See* 50 C.F.R. § 402.12(k)(1). However, if the BA concludes that listed species are in fact likely to be adversely affected, the agency then must ordinarily enter into

5

formal consultation with the wildlife service. *See Forest Guardians,* 450 F.3d at 457. Formal consultation requires the wildlife agency to produce a "biological opinion" that evaluates the nature and extent of the proposed action's effect on the listed species and that, if necessary, "posits reasonable and prudent alternatives to the proposed action." *See* 50 C.F.R. § 402.14.

Where a proposed action "may affect" endangered and threatened species, but the agency desires to avoid the lengthy and costly process of formal consultation, it may first initiate informal consultation. *See* 50 C.F.R. § 402.13. Informal consultation, which includes "all discussions, correspondence, etc., between the agency and the wildlife service," may serve as a precursor to formal consultation. *Id.* However, if informal consultation results in a finding of no effect, then the consultation process is terminated, and no further action is required. *Id.* If informal consultation results in a finding, though, that the action is likely to adversely affect listed species or habitat, then subsequent formal consultation is required.

In reviewing alleged ESA violations, as with NEPA violations, the court considers whether the agency acted in an arbitrary and capricious manner. *See Defenders of Wildlife v. EPA*, 420 F.3d 946, 959 (9th Cir. 2005).

**B. The ARRA-funded Roadside Clearing Project in Los Padres National Forest**

The Los Padres National Forest encompasses approximately 1.75 million acres of land in the central California coast, ranging from Monterey County to San Luis Obispo, Santa Barbara, Ventura and Kern Counties. Los Padres is divided into five administrative units called "ranger districts:" (1) Monterey Ranger District; (2) Santa Lucia Ranger District; (3) Santa Barbara Ranger District; (4) Ojai Ranger District; and (5) Mount Pinos Ranger District. The Project challenged involves the clearing of vegetation and trees from ten feet on each side of about 750 miles of roads throughout the Los Padres National Forest. The Project is funded by the ARRA, under the category of "hazardous fuels reduction." According to Forest Supervisor Peggy Hernandez, the

6

Case No.: 10-CV-03653-LHK
ORDER GRANTING PRELIMINARY INJUNCTION

1   goals of the Project are to provide jobs, lower the risk of forest fires, maintain access to system

2   roads, and improve driving and road safety. *See* Decl. of Los Padres National Forest Supervisor

3   Peggy Hernandez ("Hernandez Decl."), attached as Exh. 1 to Defs.' Opp'n to Pl.'s Mot. for Prelim

4   Inj. [dkt. #36-1].

5         There is no dispute regarding the environmental review and lack of public or interagency

6   notice in connection with the Project. In approving the Project, the Forest Service did not prepare

7   an EIS or an EA. In July and August of 2009, the Forest Service reviewed and decided on a list of

8   roads where work on the Project would occur. *See* Decl. of Jeff Kuyper, In Support of Mot. for

9   Prelim. Inj., ¶¶ 8-9 [dkt. #10]. On September 3, 2009, Forest Service Biologist Kevin Cooper

10  completed a draft Biological Assessment, in which he concluded that the Project would have no

11  effect on any threatened, endangered or sensitive species *if* certain stipulations were implemented.

12  *See* Decl. of Kevin Cooper ("Cooper Decl."), attached as Exh. 2 to Defs.' Opp'n [dkt. #36-2].

13  Those stipulations involved mitigation measures such as: (1) required use of a Forest Service

14  Biologist to accompany workers in certain areas (e.g., in habitat of Smith's Blue Butterfly,

15  including seacliff buckwheat); (2) limited operating periods to avoid certain species' breeding

16  seasons (e.g., no cutting from March 1 to August 1 to protect Goshawks' nesting season); and (3)

17  avoidance of cutting riparian vegetation to protect habitat of water-based species including

18  California red-legged frogs and arroyo toads. *Id*. The Forest Service did not contact the Fish and

19  Wildlife Service to consult on any of the potential impacts of the Project.

20        Also in September 2009, another Forest Service Botanist drafted a "Botanical Issues

21  Memorandum" (BIM), which reviewed the Project's potential impacts on federally threatened,

22  endangered or proposed species and critical habitat, and sensitive plant species. *See* Exh. B. to

23  Cooper Decl., "ARRA Road Brushing Project Botanical Issues Memorandum." Similar to the

24  Forest's Service's internal BA, the internal BIM recommended certain mitigation procedures (e.g.,

7

Case No.: 10-CV-03653-LHK
ORDER GRANTING PRELIMINARY INJUNCTION

flag and avoid removal of certain plant species) to avoid harmful impacts on threatened or endangered species. *Id*.

On September 11, 2009, and on the basis of the Forest Service BA and BIM, Supervisor Hernandez issued a ruling that the Project was subject to a Categorical Exclusion under NEPA. *See* Exh. C to Hernandez Decl., "ARRA Roadside Brushing Project NEPA Checklist." According to that two-page NEPA Checklist, Supervisor Hernandez found the Project subject to a Categorical Exclusion pursuant to 36. C.F.R. §220.6(d)(4). *Id*. That regulation provides:

> (d) Categories of actions for which a project or case file and decision memo are not required. A supporting record and a decision memo are not required, but at the discretion of the responsible official, may be prepared for the following categories:
>
> ***
>
>     4) Repair and maintenance of roads, trails, and landline boundaries. Examples include but are not limited to:
>
>         (i) Authorizing a user to grade, resurface, and clean the culverts of an established NFS road;
>         (ii) Grading a road and clearing the roadside of brush without the use of herbicides;
>         (iii) Resurfacing a road to its original condition;
>         (iv) Pruning vegetation and cleaning culverts along a trail and grooming the surface of the trail; and
>         (v) Surveying, painting, and posting landline boundaries.

The NEPA Checklist ends with Supervisor Hernandez's determination that "there are no extraordinary circumstances related to the proposed action [the Project] that warrant further analysis and documentation in an EA or EIS. None of the extraordinary circumstances described in 36 C.F.R. 220.6(b) exist." *See* ARRA Roadside Brushing Project NEPA Checklist at 2. According to Supervisor Hernandez, the Project was advertised to potential bidders in January 2010, and the contract for the Project was awarded in February 2010. The total contract award amount was $1,097,197. *See* Hernandez Decl., ¶ 12.

The Forest Service did not disclose the existence of the planning process, or the conclusion of its own internal environmental evaluation, to the public or to any interested parties. Nor did the Forest Service consult with the Fish and Wildlife Service regarding the Project's potential impacts

8

Case No.: 10-CV-03653-LHK
ORDER GRANTING PRELIMINARY INJUNCTION

on threatened or endangered species. Rather, in mid July 2010, the Forest Service issued a press release describing the Project, and stating that the Project would begin on July 28, 2010.

### C. Measures Taken During This Litigation

Plaintiff filed suit on August 18, 2010, and moved for preliminary injunctive relief on August 26, 2010. Upon this action's reassignment, the Court set an expedited briefing schedule and hearing for September 7, 2011. The parties, however, requested multiple continuances. First, on September 2, 2010, the parties filed a joint stipulation stating that they have been in "good faith discussion to try to resolve this lawsuit through a negotiated settlement" and requested a 45-day continuance of the PI hearing. *See* September 2, 2010 Joint Stipulation [dkt. #21]. In that Joint Stipulation, the parties agreed to "interim measures" that included, among other conditions: (1) the Forest Service's prompt consultation with the Fish and Wildlife Service pursuant to provisions of the Endangered Species Act (ESA); (2) employment of a qualified biologist to review proposed clearance areas; (3) avoidance of vegetation removal within 15 feet of any riparian or wetland areas as determined by the on-site biologist; (4) clearance of roads only in the Monterey County Ranger District; and (5) weekly e-mail reports by the Forest Service to Plaintiff regarding the progress of the Project. *Id*. Based on these interim measures and the parties' representations of good faith efforts at settlement, the Court adopted the Joint Stipulation and continued the PI hearing to November 2, 2010. *See* September 7, 2011 Order [dkt. #22].

On October 26, 2010, the parties filed a Second Joint Stipulation requesting a continuance of the PI hearing on the ground that consultation with the Fish and Wildlife Service was taking longer than expected. *See* October 26, 2010 Second Joint Stipulation [dkt. #27]. The parties requested an additional 30 days (from the scheduled November 2, 2010 PI hearing), and stated that "they believe that this time period will be sufficient to reach a global settlement and would not envision asking for any additional extensions." *Id*. The Second Joint Stipulation included similar and additional "interim conditions" pending global settlement -- the Government mentioned nothing about necessary approval of the settlement by other agencies. The Court adopted this Second Joint Stipulation on October 27, 2010, and continued the PI hearing to December 16, 2010.

9

Case No.: 10-CV-03653-LHK
ORDER GRANTING PRELIMINARY INJUNCTION

On December 1, 2010, the parties filed a Third Joint Stipulation requesting a continuance, again stating that the settlement process has taken longer than anticipated, and again requesting a 30 day continuance. *See* December 1, 2010 Third Joint Stipulation [dkt. #32]. In that Third Joint Stipulation, the parties also informed the Court that the Fish and Wildlife Service issued a November 10, 2010 letter in response to the consultation initiated by the Forest Service. The Fish and Wildlife Service's three-page Letter concurred with the Forest Service's determination that the Project, with the mitigation measures implemented, would not adversely affect threatened and endangered species. *See* November 13, 2010 Letter of Fish and Wildlife Services, attached as Exh. D to Cooper Decl. [dkt. #36-2]. The parties again stated that they believed a "global settlement can be reached within the next 30 days." On December 2, 2010, the Court adopted the Third Joint Stipulation, and continued the PI hearing to January 20, 2011. *See* Dkt. #33.

On January 10, 2011, the parties filed a Fourth Joint Stipulation requesting a continuance, in which Defendants, for the first time, informed the Court that final settlement approval required authorization by both the U.S. Department of Agriculture and the U.S. Department of Justice. *See* January 10, 2011 Fourth Joint Stipulation [dkt. #34]. The parties requested that the PI hearing be continued for an additional 45 days. On January 13, 2011, the Court adopted the Fourth Joint Stipulation in part. *See* Dkt. #35. The Court granted a continuance of the PI hearing to February 24, 2011 (35 days after the scheduled January 20, 2011 hearing).

On February 17, 2011, Defendants filed an Opposition to Plaintiff's motion for preliminary injunction. On February 20, 2011, Plaintiff filed a Reply. According to Plaintiff's Reply, Defendants have completed road clearing on approximately 165 miles of Project roads, which equals about 22% of the overall 750 mile Project total. *See* Pl.'s Reply at 2. The interim agreements, however, do not cover the remaining 78% of the Project. *Id*. The Court held a hearing on this matter on February 24, 2011. As of the date of this Order, the parties have still not finalized a settlement agreement.

## II.  LEGAL STANDARDS

### A.  Motion for Preliminary Injunction

A plaintiff seeking a preliminary injunction must make a four-fold showing: (1) that she is likely to succeed on the merits; (2) that she is likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in her favor; and (4) that an injunction is in the public interest.  *See Winter v. Natural Res. Def. Council, Inc.*, 129 S.Ct. 365, 374 (2008); *Amer. Trucking Assocs., Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009).  In lieu of establishing likelihood of success on the merits, a plaintiff may secure preliminary injunctive relief by showing "that serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor."  *See Alliance For The Wild Rockies v. Cottrell*, 2011 U.S. App. LEXIS 1473, *20-21 (9th Cir. Jan. 25, 2011).  In addition, a plaintiff must still meet the other *Winter* factors.  *Id*.

### B.  Actions under the Administrative Procedure Act (APA)

The general review provisions of the APA, 5 U.S.C. §§ 701, et seq., apply in cases asserting violations of NEPA.  *See Neighbors of Cuddy Mountain v. Alexander,* 303 F.3d 1059, 1067 (9th Cir. 2002).  Under the APA, "[a] person suffering a legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a particular statute, is entitled to judicial review thereof."  *See* 5 U.S.C. § 702.  Agency action includes the "whole or part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act."  5 U.S.C. § 551(13).  The APA applies except to the extent that a statute precludes judicial review, or agency action is committed to agency discretion by law.  *See* 5 U.S.C. § 701(a).  An agency action may be set aside under the APA only if it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law."  *See* 5 U.S.C. § 706(2)(A); *see also Morongo Band of Mission Indians v. Fed. Aviation Admin.,* 161 F.3d 569, 573 (9th Cir. 1998).

## III.  DISCUSSION

Plaintiff requests preliminary injunctive relief on ground that Defendants did not go through proper scoping procedures in deciding that the Project was subject to a Categorical Exclusion (and

did not involve "extraordinary circumstances") under NEPA. Defendants oppose preliminary injunctive relief, arguing: (1) the internal scoping process and decision not to consult with Fish and Wildlife Service were appropriate given the Forest Service's own finding of no environmental harm and the ARRA's goal of moving expeditiously; and (2) in any event, the Forest Service has now consulted with the Fish and Wildlife Service (which agreed with Forest Service's internal environmental assessment and the conditions imposed therein) and has taken additional measures to avoid potential environmental harm as a result of this litigation.

The Court finds that Plaintiff is entitled to a preliminary injunction on the ground that Defendants' failure to conduct adequate scoping under NEPA, CEQ regulations, and the Forest Service's own regulations was arbitrary and capricious. In addition, *prior to approving the Project*, Defendants failed to consult the relevant federal agency under the ESA, the Fish and Wildlife Service, in connection with threatened and endangered species.

### A. A Preliminary Injunction is Warranted

#### 1. Likelihood of Success on the Merits

Defendants argue that the Forest Service performed an adequate level of scoping in internally reviewing the Project's potential environmental effects and in determining that the Project was subject to a "Road Maintenance" Categorical Exclusion. Under these circumstances, Defendants continue, no public notice, no interested party participation, and no interagency consultation was required. The Court does not agree.

Plaintiff is likely to succeed on its claim that the Forest Service failed to invite public and interagency comment as part of the scoping process under NEPA and the Forest Service's own regulations. As Defendants acknowledge, NEPA requires federal agencies to involve the public in decision-making that affects the quality of the human environment. *See* Defs.' Opp'n at 15 (citing CEQ regulations on appropriate NEPA procedures). The Forest Service's *own* regulation, at 36 C.F.R. § 220.4(e), requires the Forest Service to perform scoping in accordance with those same CEQ regulations on NEPA procedures. In addition, at the February 24, 2011 PI hearing, counsel

for Defendants acknowledged that the Forest Service had not done everything perfectly and was not sure exactly why public or interagency notice was not given.

The relevant regulations do not dictate a specific type or amount of scoping and/or public participation. In connection with the challenged Project, however, Defendants allowed for *no* public input and *no* interagency consultation in evaluating the environmental impacts of the Project. This behavior flies in the face of the goals of NEPA scoping, which demand an "early and open process for determining the scope of issues to be addressed and for identifying the significant issues related to a proposed action." *See* 40 C.F.R. § 1501.7; *see also* 40 C.F.R. § 1506.6, "Public Involvement" (requiring all federal agencies to "[m]ake diligent efforts to involve the public in preparing and implementing their NEPA procedures."). In this case, there was no scoping notice (or notice of any kind) prior to the Project's approval as a Categorical Exclusion in September 11, 2009. *See Sierra Club v. Bosworth*, 510 F.3d 1016, 1026 (9th Cir. Cal. 2007) (post-hoc consideration of information and data "would frustrate the fundamental purpose of NEPA, which is to ensure that federal agencies take a 'hard look' at the environmental consequences of their actions, *early enough so that it can serve as an important contribution to the decision making process*.") (emphasis added).

Defendants also suggest that they were proceeding on the most "expeditious basis" possible as required by the ARRA. *See* Defs.' Opp'n at 17. But, as Defendants acknowledge, the "ARRA mandates that the Forest Service comply with NEPA." *Id*. As noted above, NEPA regulations require a scoping process, and that scoping process should be "open" and should "invite the participation" of affected Federal agencies and "other interested persons." The Forest Service has discretion to decide on the exact contours of the scoping and public notice, but the failure to provide any public notice and to perform any consultation likely amounts to arbitrary and capricious action on the part of Defendants. *See Citizens for Better Forestry v. United States Dep't of Agric.,* 341 F.3d 961, 970-71 (9th Cir. 2003) (in connection with completion of EA, the "wholesale neglect of the regulations' mandatory inclusion of the public in the process results in a procedural injury. Moreover, it undermines the very purpose of NEPA, which is to 'ensure[] that

federal agencies are informed of environmental consequences before making decisions and that the information is available to the public.'").

Defendants cite to three out-of-Circuit cases for the proposition that NEPA does not require a certain type or amount of public involvement in decisions where the agency decides an EIS is not necessary. *See* Defs.' Opp'n at 15. Although not controlling, none of those three cases supports Defendants' action here of failing to have any notice in connection with approval of the Project. In fact, in each of the cases cited by Defendants, the agency decision under question had some form of public notice and comment. *See TOMAC v. Norton*, 433 F.3d 852, 861 (D.C. Cir. 2006) (finding that the Bureau of Indian Affairs acted appropriately in not seeking further comment on a draft EA given *previous rounds of public comment and public involvement* on a substantially similar EA); *Greater Yellowstone Coalition v. Flowers*, 359 F.3d 1257, 1279 (10th Cir. 2004) (rejecting argument that U.S. Army Corps of Engineers acted arbitrarily and capriciously where Corps *issued a public notice*, but did not describe alternatives to proposed action); *Utah Envt'l Cong. v. Bosworth*, 370 F. Supp. 2d 1157, 1168 (D. Utah 2005) (concluding that scoping was appropriate where challenged project had been through *several comment periods over five years and where plaintiff was allowed to comment prior to final agency decision*).

In sum, Plaintiff has established a likelihood of success on the merits on its claim that Defendants' internal scoping violated the requirements of NEPA, CEQ regulations, and the Forest Service's own regulations.[2]

### 2. Likelihood of Irreparable Injury

"[T]he Supreme Court has instructed us that '[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e*., irreparable.'" *See Alliance For The Wild Rockies*, 2011 U.S. App. LEXIS 1473, *22-23. Plaintiff bears the burden of "show[ing] that irreparable harm is likely to result in the absence

---

[2] Plaintiff's Complaint also challenges the Forest Service's conclusion that the Project was subject to a Categorical Exclusion under NEPA. The Court does not reach this claim at this time. The parties have agreed to an expedited briefing schedule with respect to the merits of Plaintiff's Categorical Exclusion claim.

of an injunction." *Id.* at \*21.  Here, Plaintiff claims both procedural harm, as well as substantive environmental harm due to the Project.

Plaintiff has established likelihood of irreparable injury on both accounts.  First, Plaintiff has demonstrated procedural injury stemming from Defendants' failure to solicit any public or interagency comment prior to approving the Project.  Defendants' failure to conduct an adequate scoping process deprived Plaintiff and the public "of the opportunity to participate in the NEPA process at a time when such participation is required and is calculated to matter."  *See Save Strawberry Canyon v. Dept. of Energy*, 613 F. Supp. 2d 1177, 1187 (N.D. Cal. 2009) (due to alleged NEPA violations involving failure to conduct environmental review, plaintiff was "virtually certain to suffer irreparable procedural injury absent an injunction"); *see also Ctr. for Food Safety v. Vilsack*, 2010 U.S. Dist. LEXIS 141390, \*6-14 (N.D. Cal. 2010) (finding that "Plaintiffs have demonstrated significant procedural injury stemming from the NEPA violations").  This violation is especially unfortunate where Plaintiff's purpose is to participate in the environmental review and protection of the Los Padres National Forest.

A procedural injury on its own, however, is not necessarily sufficient to warrant the issuance of an injunction.  *See Citizens for Better Forestry*, 341 F.3d at 970-71 (the procedural injury from a NEPA violation is usually "tied to a substantive harm to the environment").  Here, Plaintiff's procedural injury is tied to a substantive environmental harm in two ways.  First, there is an "added risk to the environment that takes place when governmental decisionmakers make up their minds without having before them an analysis (with public comment) of the likely effects of their decision on the environment.  NEPA's object is to minimize that risk, the risk of uninformed choice."  *Id.* (internal citation omitted).  By failing to seek any public or interagency comment, the Forest Service's decision risked a less-than-fully-informed-choice.

And second, as the Forest Service's own biologists noted, the Project potentially threatens certain critical habitat and species.  The Forest Service's agreement to accept certain "interim conditions" as a result of this litigation does not remedy the harm, especially since those "interim conditions" do not apply to the remaining portion of the Project.  *See Sierra Club*, 510 F.3d at 1026

15

Case No.: 10-CV-03653-LHK
ORDER GRANTING PRELIMINARY INJUNCTION

("postdecision information may not be advanced as a new rationalization either for sustaining or attacking an agency's decision"). Defendants' agreement to take on significant "interim conditions" in the course of this litigation suggests that additional precautions should have been taken in the first place, precautions the Forest Service could have considered if it had solicited any public or interagency comment.

Accordingly, Plaintiff has made a satisfactory showing that it will suffer irreparable harm if the Court does not issue an injunction.

### 3. Balance of Equities and Public Interest Favor an Injunction

In light of Plaintiff's showing of likelihood of success on the merits and of likely irreparable harm, the balance of equities and public interest tip in favor of Plaintiffs. *See South Fork Bank Council of Western Shoshone of Nevada v. United States Dep't of Interior*, 588 F.3d 718, 728 (9th Cir. 2009) (finding that issuance of an injunction pending consideration of environmental impacts under NEPA comported with the public interest). The Court takes seriously Defendants' interests in seeing the Project proceed. Those interests involve maintaining the safety and access of Forest Service roadways, avoiding Forest Service difficulties in fighting potential forest fires, and not losing the benefit of the $1,000,000 in funds to finance the Project. *See* Supervisor Hernandez Decl. ¶¶ 5-6, 17-18. However, Defendants provide no explanation as to how they will "lose" the $1,000,000 funds or that a temporary delay or modification to the Project's implementation will hamper efforts to fight forest fires." *See Alliance For The Wild Rockies*, 2011 U.S. App. LEXIS 1473, *29-31 (finding balance of equities and public interest favored preliminary injunction where risk of revenue and job loss was too speculative). Moreover, the Court shall tailor the injunction to allow the Project to proceed. Thus, the injunction will be no greater than necessary to avoid irreparable harm to Plaintiff and the environment.

### B. Remedy: Scope of Injunction

Plaintiff initially sought a stoppage of the entire Project. However, in the course of this litigation, the parties have agreed to interim measures that have allowed the Project to proceed for the past six months. *See* September 2, 2010 Joint Stipulation and October 21, 2010 Joint

16

Case No.: 10-CV-03653-LHK
ORDER GRANTING PRELIMINARY INJUNCTION

Stipulation. These interim measures include: (1) use of an on-site biologist prior to clearing sensitive areas and critical habitats; (2) prohibition on clearing vegetation in certain riparian and wetland areas; (3) prohibition on clearing in certain areas of the forest (i.e., near seacliff buckwheat areas where Smith's Blue Butterfly inhabit); (4) prohibition on clearing in certain locations during nesting and breeding seasons of certain species; and (5) weekly progress reports to Plaintiff.

In these circumstances, the Court finds that the purpose of injunctive relief, the preservation of the "status quo" prior to a final determination of the merits, entails the Project's implementation with all of these interim conditions in place as specified by the parties' September 2, 2010 and October 21, 2010 Joint Stipulations. Thus far, the parties have succeeded in stipulating to mutually agreeable interim measures. Because these interim measures were not tailored to the remaining portions of the Project and because seasonal changes may require new or modified measures, the parties are ordered to meet and confer to attempt to reach stipulations regarding any additions or modifications to the interim measures. If, despite good faith efforts, a mutually agreeable resolution is not possible, the parties shall file a motion for administrative relief pursuant to Civil Local Rule 7-11, in which case the Court will resolve the dispute on an expedited basis.

### IV. CONCLUSION

For all the foregoing reasons, Plaintiff's motion for a preliminary injunction is GRANTED. The Project may proceed only under the conditions specified above. The preliminary injunction shall take effect upon the filing of this Order, and, unless otherwise modified by the Court, shall last until the Court's decision on the merits.

As agreed upon by the parties at the February 24, 2011 hearing, the following expedited summary judgment briefing schedule is adopted: opening motions are due by March 25, 2011, oppositions are due by April 15, 2011, and replies are due by May 6, 2011. The hearing on any such motions is set for Thursday, May 19, 2011 at 1:30 p.m.

**IT IS SO ORDERED.**

Dated: March 4, 2011

                                              LUCY H. KOH
                                              United States District Judge